Go right ahead. May it please the court, my name is Richard Hammer. I'd like to tackle an important issue on this appeal first, which is why all of these sanctions didn't cure the misconduct and make this a fair trial. And I'd like to do this by comparing the trial that we had, which I'm going to refer to as the sanctions-driven, and the trial that we would have had, the opportunities that were lost, if the government would have provided us with all of the disclosure three weeks before trial started as ordered by the court. And in the trial that should have taken place, we would have been able to use this information to investigate, prepare, and present the best defense that we could have had. For example, we would have opened not eight weeks after the first witness is called, but before the first witness is called. And in that opening, and please understand that much of the best impeachment was disclosed not in the first week or two weeks of the first wave, but seven weeks into this jury trial. And that wave consisted of the most fertile impeachment of John Tye, the star witness, and his wife. And as an example in the opening statement, instead of giving a generic, the government isn't going to prove this, they're not going to prove that, which is what I gave, you start out on the Elmo with these coded emails between the lead agent and the star witness, and the jury starts getting the impression, well, this John Tye has a lot of influence in this case. And then in that opening statement, that is a directed opening statement, you explain that when defendant Lloyd Talia was arrested, he wasn't taken before the magistrate first, he wasn't allowed to speak with an attorney, he went directly to John Tye. And with some bear hugs and Samoan, 30 minutes later, he was converted as a government witness. And from there, in that directed opening statement, John Tye had 22 briefings with the government. John Tye was actually making a movie at the time, had hired a director on the outside, as we're starting to get ready to attack the audio video. Crucial, we didn't know this until the seventh week, but the wife of John Tye, who made the video and had this bug on her lapel, and John Tye were given an operational meeting to propel the strategy of the government. And John Tye, while cooperating, was lying to the government. He and his wife were still dealing. And at the end of that opening statement, you say, and our defense is that John Tye framed Mr. Dominguez, his spear of influence, was so great, and many of the accomplices, when they were first interviewed, never mentioned Mr. Dominguez. Maybe one of them, I believe it was Lloyd Talia, didn't mention him the first five times, but only... didn't mention Dominguez when he made his first honest statement. So there is that motive, means, and opportunity for somebody as Spengali and persuasive. He's a legend. Rap songs were written about him, and the agent said this is one of the two smartest informants or witnesses or accomplices that we've ever worked with. So it wasn't out of the realm of possibility to influence. Now, after a real opening statement, which cases say are very important in a complex case, we go to cross-examination. The first witness is Lead Agent Chambers, and rather than being cross-examined with this incredible information that he participated in violating rules of the Bureau of Prison with these coded emails, he basically skates by, and six weeks later, we're allowed to cross-examine him. So, you know, the government always wants to start with their right foot forward and their lead agent, and he did just fine, but he wouldn't have done fine if the government would have given us the impeachment. After that, every witness that's called by the government, instead of the scattershot, generic cross-examination, it's all pointed towards the defense, which the jury is clued in on, that is the John Ty spear of influence is affecting. Then we get to, and not only that, we can, instead of learning these jewels which come from the inside, there's no investigator in the world that could have penetrated the government and learned this. It's not like we failed in our investigation, but once we know this, we're able to subpoena, to go inside the jail. Who was he with? Talk to people. See what was said, what was done. The journals, the seven journals that he wrote that we never got to see, maybe they would have been available. Our judge would have been much more amenable to granting motions such as John Ty's jailhouse records, which could have shown a pattern if I had something to work with. When we got to closing argument, I had two arguments to the jury. One, the most pathetic argument a defense lawyer can make, that's a jury pardon. And the second was, there's some failure of proof. But still, in almost all the cases in the Ninth Circuit, coring the district case that went up to the Ninth Circuit, but then the government owned up to it, Judge Matz's Aguilar-Nordiega, we have juries that are out a day or so. And in this circuit, when we have a jury out two weeks, that's close case. In this case, the jury did acquit of some of the charges. That's right, Your Honor. We won 13 out of 18. So, what significance, if any, do we give that in weighing the effectiveness or appropriateness of the way the district court chose to handle the case? Well, one could argue, and I'm sure it will be argued, that the sanctions caused that success. But one could also argue, that's somewhat speculative, and if a directed defense investigate, have a theme, stay on message, and argue your theory of the case, which is almost structural in the Ninth Circuit. The Ninth Circuit actually did rule that if there was a case where a defendant wanted to argue alternative theories, was denied by the district judge, and the Ninth Circuit said, you don't even have to show harmless errors. Unfortunately, the Supreme Court didn't agree, but that's how highly in esteem the Ninth Circuit holds your theory of the case. I didn't have the opportunity to argue the theory of the case that I submitted, because the judge gave me a choice. But arguably, she gave you a bigger prize. She struck a lot of testimony, critical testimony for the government. And getting back to Judge Graber's point, I just want to make sure you have time to close this loop, counsel, because you argue that there was, I think, two weeks of deliberation, very long deliberation here. And it seems to me that one of your most persuasive arguments is that the jury had heard so much evidence prejudicial to your client, and it was very tough to unring that bell. But they did acquit on several charges, and they deliberated a long time. And it seems to me to be a reasonable inference that that's consistent with parsing through the evidence carefully to follow the judge's instructions about what evidence they were not to consider. I agree, but that's why I thought it would be most illuminating for this panel to compare. Would you rather be given all of this discovery three weeks ahead of time, or be in a sanctions position where you're hoping the jury is going to punish the government? And there's not a legal trustees, there's not a professor, an expert that doesn't say in the books, investigate your case, prepare your case, and stay on theme with one defense, don't be the scattergun approach to things. But to finish that thought, your theme was that this was John Tye setting your client up, essentially, and convincing other folks to testify against him. And how was that theme derailed? Well, that theme was derailed because I couldn't investigate this information that came to us improperly in the seventh week. I wasn't able to open with it, which is an important right. I wasn't able to cross with it. When you say you weren't able to cross with it, some of these witnesses were called back, and you were allowed to cross with it. But not with the information that was given in the seventh week. John Tye was already struck as a witness, and in other words, we just weren't on theme and we weren't directed. And the answer to Judge Graber's question is, if the trial with all of the discovery is, according to any legal scholar, is the better way to go than a sanctions-driven, we would have improved upon winning 13 out of 18 counts. I just see that as the jury having doubts. But the other way to look at it is that if Mr. Tye had testified, if he's as much of a Svengali as you're saying, he might have persuaded the jury to convict on everything. So it's a bit of a crapshoot. Well, that's true. I think that we're speculating. I think you have to go with what a reasonable defendant, what makes sense to us as litigants, what defense we'd rather present. That isn't precisely the question we're given, though. The question that we're to answer is whether the district court abused its discretion in selecting this array of sanctions. And even if it's not the very best outcome, from your perspective, does that necessarily equate to an abuse of discretion? Yes, because the sanctions have to cure the misconduct and make it a fair trial. And even with the sanctions, the Federal Rules of Criminal Procedure, we were just so discombobulated, everything was out of order that that wasn't cured. The sanctions were well intended, but they didn't present Mr. Dominguez with his best defense. I want to speak for a short time on flagrancy. It's difficult for the district judges to find flagrancy. As the courts have written, rarely are intentional violations, do they surface with a blizzard of papers and motions? It's tough to see the forest through the trees. And district judges have expressed they're reluctant. The tendency is to trust the federal prosecutors. And I think if we looked at this objectively in five ways, were there safeguards? The amount and types of violations? Did it relate to the essential proof? Was there a win-at-all-cost philosophy? And was the government, which is very important, forthright to the court? And the testimony was there was no instruction to document impeachment. On the accomplice pre-sentence reports, the government's policies, we don't submit those in camera. As far as being judicious and looking at the Thai emails, the government was sitting on a ton of impeachment and just argued Mr. Hammer's on a fishing trip and allowed John Thai to go back that night and do what he wanted. I mean they wouldn't even look at it or preserve it. The vast amount, thousands of items, just not by accident. And why did all this impeachment relate to two lead agents, star witness, and four accomplishments? Everything that was important to the government was not disclosed. They put on all these witnesses and we didn't have the impeachment. You have exceeded your time. We'll give you a couple minutes. I appreciate that. We'll hear from the government. May it please the court, James Pierce from the criminal division appellate section for the United States. The district court was harsh but fair when it described the government's discovery practices as sloppy, inexcusably tardy, and almost grossly negligent. She might have been generous. I'm sorry? She might have been generous. You said she was harsh but fair and I'm suggesting she may have been generous, counsel. I think that's fair, Judge Kristen. The government's violations in this case were manifold and I'm not up here to defend. They were appalling. They were indeed, Judge Graber. They were basic Giglio information, basic discovery practices that the government should have done. Brady and Giglio and Jenks Act, right? That's correct. Now, just one very small caveat. To the extent that we focus only on Brady as exculpatory, there's nothing to suggest exculpatory but lots of Giglio. Giglio, of course, is functionally Brady. So the court is clear on that. And the AUSA's explanation was remarkably thin. Explanation as to why there were the violations. I agree, Your Honor. The same AUSA. The same AUSA who had signed off on some of these proffers, right? Was asking the questions in the courtroom and not correcting false testimony. That's what opposing counsel is going to say. It is the same AUSA to respond to Judge Bybee. In terms of not correcting false testimony, it was unclear that there was cross-examination that drew out the fact that there was cooperation happening. And in many instances on direct, the AUSA had made clear that there was cooperation happening. Counsel, we're not going to go down that trail, I don't think, right? Because you know that we've read that record very, very carefully. Certainly, Your Honor. So it's not a contested issue, is it? No, and let's be clear. Let me be clear. There are four parts to the dismissal inquiry that this court looks at. Were there violations? Were those violations the product of flagrant misbehavior by the government? Did that flagrant, that's step two, did that flagrant misbehavior substantially prejudice the defendant, step three? And then finally, were there alternative measures that could have cured the prejudice or did cure the prejudice short of dismissal? And I think we're all the way up to the last question. And I'm happy to address that. I would disagree, Your Honor, as to step two. The district court on multiple occasions and the district court who was overseeing the entire trial made a couple of factual findings, and this court in Chapman said, of course, that factual findings are reviewed for clear error, that the prosecutor was not acting flagrantly. Now, again, I'm not up here. It's tough for us to unring that bell. It's really tough for us to roll back the clock because these discovery violations weren't all known to the district court at one time. They rolled out sequentially, and findings were made sequentially. That's correct, Your Honor. But the district court did issue its, in fact, June 30, 2015 order, which dealt with motions to dismiss that Mr. Dominguez joined and some subsequent ones that he did not. And in all instances, the district court said the same language, grossly negligent but not flagrant. And I think the difference is when you look at a case like Chapman, and Chapman says reckless disregard for constitutional obligation gets you into that flagrancy box as well. The AUSA, who is no longer with the department at this point, the AUSA dropped the ball. The AUSA was sloppy. The AUSA did not turn over this information. But as soon as it was brought to the AUSA's attention, he complied. His co-counsel, who's with me here today, made every effort to comply as well. And there were not affirmative misrepresentations, as there were in Chapman, that, yes, we've already turned that over already, and then the AUSA and Chapman... Is that required to find flagrancy, though? I mean, isn't hiding the ball enough? Your Honor, this court's cases don't suggest that hiding the ball is enough.  Motion to dismiss that you have to get through that flagrancy question. And, yes, failing to turn over this copious amount of information, regardless of how busy you are, as the AUSA suggested in the affidavit, that's negligent, grossly negligent. But there's nothing to suggest when it's not willful and when there are not affirmative misrepresentations that, yes, I've done that, that that gets you up to flagrancy. Counsel, let's set aside for one minute the question of flagrancy. You can certainly understand why a district court seven weeks into this trial wouldn't want to upset this thing, if possible. The district court's trying to preserve this, if at all possible. It's an enormous use of resources of the court, the United States, the defense. But doesn't defense counsel have a really good point that says, hey, look, if I get all this stuff in the way it's supposed to be given to me, I've got a different opening, and I get to give my opening on time. I get to give my opening at the opening of the trial instead of halfway through the trial. I get to approach witnesses differently. Maybe some witnesses, if they know that I've, if the government knows that I've got this, then, you know, Ty's testimony either doesn't come in or it comes in in a far more limited sense. I've got cross-examination, and now I've, they've heard Ty, and yes, his testimony is now going to be excluded. But they've heard everything. The jury's heard it all. I think that's a fair point. But I also think that the district court's sanctions provided essentially that hypothetical trial that Mr. Hammer has presented or suggested would have taken place in the absence. And here's why. Not only were there second opening statements, albeit not at the beginning of trial, but the district court on more than one occasion instructed the jury and said, we are taking, in one case, we are taking a break because the government failed to comply with its discovery obligations. We are recalling these witnesses, Jordan Fanati, Pula Gatolai, because the government didn't comply with its discovery obligations. When Mr. Hammer and some of the other co-defendants' counsel got up and made their arguments in those second openings, which the district court probably fairly characterized as essentially closing arguments, they were focused on precisely the types of things that Mr. Hammer has identified here, the kinds of problems with the government's discovery and handling of the case and look at all the problems that the government has. That's the type of sanction, and of course now we're at that sanctions question essentially. Did the sanction cure the prejudice? To be clear on point three, I'm not going to fight the fact that there was substantial prejudice to the defendants. I think that's a fair point. The district court didn't ever say substantial prejudice, but there was a lot of prejudice, and that's not worth disagreeing about. But those sanctions that allowed for that argument to be made, that recalled the witnesses, subjected them to cross-examination, told the jury, by the way, this is because of the government's failings, that provided the type of curative measure that keeps this case within the larger question of whether the district court abused its discretion in not dismissing the indictment, which of course is the ultimate nuclear option here. She wasn't left with very good options at all, was she? The district court had limited options as these violations continued to roll out and roll out and roll out. That's correct, but the district court, she imposed these options, these sanctions, appropriately to the type of violations. As more information about John Tye came out, she then ultimately struck the testimony. And to the colloquy earlier, the jury's acquittal, and in fact back up a little bit before the jury's acquittal, the government's acquiescence on counts 2 to 5 and 7 to 10, in combination with the jury's acquittals on counts 6, 11, 12, and 13, are strong indication, we don't know, we're always speculating with the jury, but strong indication that not only were the sanctions effective, but the jury listened to the judge's instructions, followed the- John Tye's testimony essential to the counts on which Mr. Dominguez was convicted? On which he was convicted? No. There was some relevance to it, but it was not essential. So count 1 is the conspiracy count, and there is a lot of other evidence from witnesses about whom there is no discovery objection whatsoever. Counts 14 through 17, the primary evidence from that came from Larry Chung. Larry Chung was, at one point, sort of the primary underling to John Tye in Hawaii,  Larry Chung, the court may recall, was arrested with about 118 pounds of meth and testified this came from Walter Dominguez. There's also testimony from the Fuamatus, this was the married couple that talked about the wife who worked for Delta and used the TSA to go back and forth, the husband who was one of the drug couriers, and they talked about meeting with Walter Dominguez around the time of the dates of 14, 15, and 16, the counts on which the jury convicted. And then finally there's Anthony Leon as well, who has none of the Hawaii connections, he came to Hawaii as he testified, he knew Walter Dominguez earlier, and he served as a courier going back and forth. That's most relevant to count 1, the conspiracy count. Now, there are a couple of other points that were brought up, the question of the journals, I think it is fair to characterize that as a phishing expedition. The government simply didn't know about that until cross-examination, Mr. Hammer elicited it, sought to ask additional questions in front of the jury, the district court handled that quite capably, said let's allow that outside of the presence of the jury, this isn't direct to the proof, gave Mr. Hammer the opportunity to ask additional questions to make a record about is there possible Rule 16 or Jenks or Giglio information in these journals, and there were no questions asked at that point. And instead there followed a motion saying we just want the journals, and in fact not only saying we just want the journals, but for swearing any type of in-camera review which sort of follows this court's precedent. I agree that there's not a strong journal argument, but let's back up a little bit please. Certainly. Because it seems to me there's another problem that the defense counsel has fairly raised, and that is not only that there were a lot of violations, but there was, it's just a sheer bulk of the evidence. What he's arguing in part is that they were discombobulated. It takes a while to sift and sort, and some of these messages were coded, and they didn't have the code for part of the time. What about that? What about just, as I read his brief and understand his argument is that there was a hand grenade, you know, in the middle of this trial, and they were left scrambling. A couple of responses, Judge Kristen. As to the sheer amount of it, the relative violations that the court ultimately found were not quite as extensive as suggested in the brief. I mean, it's the Fanati proper agreement, the Gatolai proper agreement. There's admittedly quite a bit of information about John Tye. What about the recordings? John Tye, in case I wasn't clear. I'm speaking of that. So the recordings are, there's no discovery questions about the recordings. The email correspondence and the FTC, if you're referring to the FTC recordings, that's different than the... I am, I am. Certainly. The court did recess and told... For how many days, counsel? The recess happened on a Tuesday at the close of business for the three trial days, so Wednesday, Thursday, Friday, and gave additional time over the weekend. So there was some substantial time for review of that material, but really the sanction for John Tye was the striking of the testimony. After he had testified. After he had testified, but again, the jury's verdict indicates or certainly strongly suggests that the bigger prize, as I think your honor put it, was the acquittal on those counts, as opposed to the opportunity to push this as the primary theory of the case. So what's in government's incentive to play by the rules next time, counsel? That's what we have to really be worried about, isn't it? Absolutely. This man was convicted of five counts, not 18. Correct. And he got a lot of jail time. He did, your honor. That's correct. 330 months in prison. So... The defense counsel's position is the government wins anyway. They broke the rules flagrantly, perhaps in his words, he would certainly want us to find that, and that they quote unquote won anyway. What about that? This is not a victory that the government sees. The deterrent function, I think I mentioned somewhat in passing, the AUSA is no longer with the department. That's a deterrent function that has serious ramifications not only for him, but that's something that... Has OPR finished its investigation? Your honor, I have to be somewhat careful about Privacy Act concerns. What I can represent to the court is that OPR conducted its investigation and concluded it without making a finding because Mr. Tai had left at that point. Mr. Tai? I'm sorry. Mr. Liu. My mistake. Isn't he on the briefs here? It sort of looked like business as usual. I'm sorry. The AUSA, wasn't he on the briefs? He was on the brief here, and one could argue that it was not the best idea for him to have written that brief. He, of course, was knowledgeable to the case, but he's not here today and I am for the government. But let me get back, Judge Christin, to your... Unless you lose that point. I mean, for the record that we have, what is presented to us are these very serious violations. We recognize that the district court referred this to the Office of Professional Responsibility. Of course, that's going to be a bit of a black box for us, and I imagine appropriately so. And then he's on the briefs, so it does look like business as usual. I'm not sure. Perhaps it does in terms of how it appears, but let me... And the reason that matters is because we have to be very concerned that the government's not going to do this again. And that's what I'm looking for, counsel. Well, again, in terms of not only the consequences to the first chair at USA, the loss of the counts as to Mr. Dominguez, keeping this as a large... This was a trial with six defendants, and four of them walk out with acquittals, one of them walks out with an acquittal on all counts, and a pung jury is to another. This is not a case where the government considers a victory. There's not only the deterrence as to the first chair at USA, there is also the larger effect to this government's case. But also... All of the defendants. And it seems to me you do have an argument there. That's correct. In response to the contention that the government won. Correct. And our response is to, well, what about Mr. Dominguez? This case right here is about Mr. Dominguez. Well, the evidence at trial, evidence about which there has been no argument as to its discovery, some of the things I mentioned earlier with Anthony Leon and with the Fuamatus, that was strong evidence on the accounts for which he was convicted. I see my time is up. May I make one brief point and then sit down, Judge Graber? Yes. Thank you. I just want to also make clear to the court that this is a set of discovery violations that the U.S. Attorney's Office has taken seriously and that the government takes seriously. Shortly after the case, the U.S. Attorney's Office conducted discovery trainings for its prosecutor, invited the National Criminal Discovery Director, who's in the Deputy Attorney General's Office, out to do trainings for the prosecutors, to do trainings for the federal investigative agencies. This is not something that the government takes lightly. And for those reasons, we would ask that the court affirm the district court's decision below. Thank you. Thank you, Counsel. Mr. Hammer, you may have two minutes for rebuttal. I appreciate that, and I'll move quickly. Mr. Hammer, there's one question that I would hope to address, and that is what effect, if any, did Mr. Tye's testimony have on the accounts for which your client was convicted? Really none. It would have been cumulative. So you're saying that Mr. Tye was not relevant? His testimony was not relevant to the accounts on which your client was convicted? I think he has some relevance. In other words, when he was struck, we're the only Hispanic. John Tye has a blood brother in the case, and the Samoans, like defendants, all kind of worshipped him. When he was struck, he was used to authenticate the voices on critical tapes for the other defendants who got Rule 29 script. I mean, they walked out of there. John Tye didn't authenticate Mr. Dominguez's voice. He was the big kahuna, the star witness, but he didn't say anything differently. He got impeached solidly. I had him admit that he was insane. The government said that Mr. Chung and Mr. Leon were the principal witnesses on the accounts for which he was convicted. 14 through 17, yes. And you don't dispute that? I agreed to that in my brief, and it relates to the audio video. That was the most crucial evidence in the case. His argument is there's overwhelming evidence of guilt, other independent overwhelming evidence of guilt, as to the accounts on which your client was convicted. Isn't Judge Bybee right about that? No, that's the myth. There was hardly any evidence of guilt against Mr. Dominguez. The government, instead of the hard blows, we got the low blows. When Mr. Dominguez was arrested, there was no search of his home, his car, his business. There was no surveillance on Mr. Dominguez. They just didn't do the job. There was nothing in the evidence. There was no forensic evidence. That's an insufficiency of the evidence problem, isn't it? It is, but it also— That's a whole different inquiry from the line that you've been arguing thus far. Well, only to the extent that the case isn't answering Judge Christen's question, that the case wasn't that strong. It was about the videotape. And coring the Alaska case, or congressman, is the best case for us because Judge Sedgway said these violations are horrible. They related to Senator Stevens' case. But these audio videos are so strong, the 17,000. The Ninth Circuit, Chief Judge Thomas writing the decision said, well, these audio videos are strong, but still we're going to find prejudice. I mean, if there's one case that could help Mr. Dominguez the most on the nub issue of whether these sanctions were sufficient, it's coring. I mean, it's so chilling when you look at the audio videos and the Ninth Circuit saying they reversed the district judge on the abuse of discretion on the finding of prejudice because they said, no, that's not going to carry the day. Thank you, counsel. You've exceeded your time. The case just argued is submitted, and we appreciate very helpful arguments from both counsel. We'll take about a five-minute recess and come back for Gian.
judges: Graber, Bybee, Christen